UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

DANIEL RICHARD LEVIN,                    :
       Plaintiff,                         :
                                       :
       v.                                  :      C.A. No. 15-422M
                                         :
CAROLYN W. COLVIN, ACTING                :
COMMISSIONER OF SOCIAL SECURITY,         :
       Defendant.                         :

## REPORT AND RECOMMENDATION

PATRICIA A. SULLIVAN, United States Magistrate Judge.

Plaintiff Daniel Richard Levin was only twenty-five years old when he stopped working in June 2012 following an injury to his inner ear caused by "40 some odd rides on roller coasters" during a single day, June 5, 2012; the resulting vertigo was coupled with the symptoms of what ultimately was diagnosed as postural orthostatic tachycardia syndrome ("POTS"),[1] as well as the mental impairments of anxiety, depression and adjustment disorder.  His April 3, 2013, applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under §§ 205(g) and 1631(c)(3) of the Social Security Act, 42 U.S.C. §§ 405(g), 1383(c)(3) (the "Act"), were initially rejected by the Administrative Law Judge ("ALJ"), who

---

[1] POTS "is one of a group of disorders that have orthostatic intolerance (OI) as their primary symptom.  OI describes a condition in which an excessively reduced volume of blood returns to the heart after an individual stands up from a lying down position.  The primary symptom of OI is lightheadedness or fainting.  In POTS, the lightheadedness or fainting is also accompanied by a rapid increase in heartbeat of more than 30 beats per minute, or a heart rate that exceeds 120 beats per minute, within 10 minutes of rising.  The faintness or lightheadedness of POTS are relieved by lying down again."  National Institute of Health – National Institute of Neurological Disorders and Stroke: Postural Tachycardia Syndrome Information Page,
http://www.ninds.nih.gov/disorders/postural_tachycardia_syndrome/postural_tachycardia_syndrome.htm
(viewed Nov. 16, 2016).  POTS symptoms may include: blurry vision and other eye problems; throbbing head; poor concentration; tiredness; gastrointestinal symptoms (for example, nausea, cramps, bloating, constipation, diarrhea); shortness of breath; head, neck and chest discomfort; weakness; sleep disorders; difficulty exercising; sweating; and anxiety.  National Institute of Health – Genetic and Rare Diseases Information Center,
https://rarediseases.info.nih.gov/diseases/9597/postural-orthostatic-tachycardia-syndrome (viewed Nov. 16, 2016).
POTS is under diagnosed because its symptoms mimic vasovagal syndrome.  A.K. Agarwal, R. Garg, A. Ritch, P. Sarkar, Postural Orthostatic Tachycardia Syndrome, 83(981) Postgrad. Med. J. 478-80 (July 2007),
http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2600095/ (viewed Nov. 16, 2016).

ignored Plaintiff's mental impairments and found that he was not disabled during the relevant time period.  After the matter was remanded by the Appeals Council because of the lack of development of the record pertaining to Plaintiff's mental health, the ALJ procured a consultative evaluation from a psychologist and expert testimony from a psychiatrist; this time, the ALJ found that Plaintiff had both physical and mental impairments, but still concluded that he had not been disabled.

The matter is now before this Court on Plaintiff's motion for reversal of the decision of the Commissioner of Social Security (the "Commissioner") denying DIB and SSI under the Act. Plaintiff contends that the ALJ erred in rejecting completely the opinions of his two treating cardiologists and erred further in crediting only the first two opinions of his primary care physician.  He also challenges the ALJ's finding that he was "not entirely credible" because it is not grounded in adequate reasons.  As a result of these errors, Plaintiff argues that the ALJ's residual functional capacity ("RFC")[2] finding is not supported by substantial evidence. Defendant Carolyn W. Colvin ("Defendant") has filed a motion for an order affirming the Commissioner's decision.

This matter has been referred to me for preliminary review, findings and recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).  Having reviewed the entirety of this very substantial record, I discern no material error in the ALJ's adverse credibility finding.  However, I find that the ALJ's rejection of the cardiologists' opinions because they are inconsistent with their treating notes and the longitudinal treating record is based on material error and is not supported by substantial evidence; in addition, I find that the ALJ erred in relying on opinions of the primary care provider, which were subsequently repudiated by the doctor who wrote them.

---

[2] Residual functional capacity is "the most you can still do despite your limitations," taking into account "[y]our impairment(s), and any related symptoms, such as pain, [that] may cause physical and mental limitations that affect what you can do in a work setting."  20 C.F.R. § 404.1545(a)(1).

Accordingly, I recommend that Plaintiff's Motion to Reverse the Decision of the Commissioner (ECF No. 9) be GRANTED and Defendant's Motion to Affirm Her Decision (ECF No. 13) be DENIED.

## I.    Background Facts

Plaintiff was employed as a poker dealer at Mohegan Sun on June 5, 2012, the day he rode the roller coaster "some 40 odd" times.  Tr. 43, 56, 1284.  Afterwards, Plaintiff insisted that he felt his neck "pop" and, despite conclusive medical evidence to the contrary, repeatedly reported to subsequent medical providers that he had fractured the "dens," a bony structure in the cervical spine.[3]  For five months, he presented a wide range of complaints to an array of providers, including his primary care physician, Dr. Todd Viccione, and the emergency departments of at least three hospitals: they included vertigo, nausea, anxiety, a pounding heart, shortness of breath, spacial disorientation, and chest pain.  Tr. 452-56, 460-66, 490-532, 684-741.  In November 2012, Dr. Jules Friedman of University Otolaryngology diagnosed an injury to the inner ear sustained in June 2012, which was causing serious vertigo, but which Dr. Friedman opined would "slowly but truly improve" over time.  Tr. 438.  Based on the obvious anxiety associated with the sensation of vertigo, Valium was prescribed; although it helped with the symptoms of vertigo, Plaintiff developed a dependency with which he continued to struggle until at least September 2013.  Tr. 1280.  However, the diagnosis of vertigo explained only some of Plaintiff's less serious symptoms; it was clear that vertigo was only part of what was wrong.

---

[3] Dr. Friedman put it succinctly: "He had an MRI of the cervical spine which disclosed some malpositioning of the dens suggesting remote trauma but a cervical CT scan was normal. . . . He has a neurosurgical second opinion with Dr. Sampath who also apparently could not readily attribute his symptoms to this apparent cervical injury."  Tr. 444.  A psychiatrist at Newton-Wellesley Hospital was openly skeptical of Plaintiff's claim of a neck fracture.  Tr. 759 ("this seems odd").  It must be noted that Plaintiff's persistence in reporting that he fractured his neck in the face of a medical record that uniformly reflects that conclusion would have been appropriate for consideration in discounting his credibility.  However, the ALJ did not mention it.

In December 2012, Plaintiff's search for a diagnosis took him to Boston, where he saw Dr. Stephen Parker at Massachusetts General Hospital ("MGH").  Tr. 1284-85.  Based on Plaintiff's dramatic increase (from seventy-two to one-hundred-four beats per minute) in his heart rate as he moved from a supine position to sitting to standing, and the feeling of faintness when standing, Dr. Parker found that Plaintiff's symptoms "raise the possibility" of POTS.  Tr. 1284.  He referred Plaintiff to an MGH cardiologist with expertise in the diagnosis and treatment of POTS, Dr. Kitt Farr.  Tr. 1284.

In March 8, 2013, Plaintiff began seeing Dr. Farr, who ordered a battery of tests.  Tr. 1291-1307.  Based on symptoms that included a racing heart, anxiety, pervasive fatigue, chest pressure, shortness of breath, difficulties with cognition, processing or task sequencing and a sense of impending faint, in addition to residual vertigo, and based on clinical observations of postural vital signs that met the diagnostic criteria for POTS, as well as "blanchable erythema of the lower shins and feet," reduced skin density and an abnormal sweat test, Dr. Farr diagnosed POTS.  Tr. 1291-92.  He initiated treatment that included a high sodium diet, a structured exercise program[4] and a prescription for Florinef.  Tr. 1291.  With this treatment, within a year (in April 2014), Dr. Farr observed that Plaintiff had improved from his pre-treatment condition of being "virtually bedbound," but that "[a]lthough significantly improved compared with his baseline, his orthostatic tolerance remains limited at the present time."  Tr. 1296.  Dr. Farr also noted that vertigo continued to limit Plaintiff's ability to use a computer or to function in a social setting.  Tr. 1296.

---

[4] This recommendation was implemented through a long-term course of physical therapy at MGH, which had been initiated by a referral from Dr. Parker.  The MGH physical therapy notes record Plaintiff's effort and significant improvement, but also that after two years he was still not functioning at the prior level.  Tr. 1203; see generally Tr. 1203-25, 1473-77.  At the last therapy appointment in the record, the physical therapist recorded the opinion that Plaintiff's prognosis was only "fair."  Tr. 1472.

In September 16, 2014, Dr. Farr noted surprise that Plaintiff's symptoms had only improved to the point that he could stand for up to fifteen minutes or sit for up to forty-five minutes before experiencing lightheadedness, shortness of breath and cognitive impairment, and needing to take "a break." Tr. 1291, 1293. He speculated that Plaintiff's failure to improve might have been impacted by the discontinuation of Florinef in January 2014, Tr. 1291, which Dr. Farr had done in part to accommodate Plaintiff's anxiety over medication (particularly in light of the troubling aftereffects of the prescription for Valium). Tr. 1293 ("It is surprising that Dan's orthostatic tolerance isn't as good as it is under the circumstances and it is possible that he has, to some degree, accommodated to his current degree of symptomatology and does not realize, which better he might feel with the adjunct of pharmacologic therapy."); Tr. 1296 ("Dan prefers to minimize the number of medications he takes, given his experience with Valium."). With Plaintiff's agreement, Dr. Farr resumed the prescription for Florinef. Tr. 1293. Soon after, this appointment, Dr. Farr wrote a relatively optimistic (by comparison with his treating note) medical opinion that POTS was causing disabling limitations, based on the inability to stand for more than thirty minutes or to sit/walk for more than two hours, with the need for one or two unscheduled breaks of fifteen to thirty minutes each over the course of the work day, together with the likelihood of missing more than three days per month. Tr. 1309.

In November 2014, Plaintiff switched to MGH cardiologist Dr. Nancy Gracin. Tr. 1343. At Plaintiff's initial appointment with Dr. Gracin in November 2014, she wrote that Plaintiff "spends most of his day lying on a sleeping bag watching TV," and that, despite compliance with treatment, his POTS was "debilitating." Tr. 1343-44. In a crucial observation that persists throughout the course of her treatment, and that echoes a similar observation by Dr. Farr, her notes record that Plaintiff was able to tolerate twenty minutes standing or forty-five minutes of

sitting, after which he must lie down and "reset," which can take from a few minutes to half an hour.  Tr. 1343, 1346, 1351, 1478.  At her last appointment in the record, in June 2015, Dr. Gracin's note indicates that Plaintiff's ability to walk had improved from one-quarter to three-quarters of a mile, but that his need to lie down to "reset" after only twenty minutes of standing or forty-five minutes of sitting persisted; she added a prescription for Nadolol to the treatment plan.  Tr. 1507.  Like Dr. Farr, Dr. Gracin recorded Plaintiff's consistent reports and her own clinical observation of "blanchable lower extremities," which indicates "abnormal pooling of blood in his lower extremities that takes away from pressure to perfuse his head when he stands." Tr. 1344, 1347, 1352, 1355, 1508.  She did not disagree with Plaintiff's report that the "[c]ompression socks prescribed are not tolerable;" rather, she switched her recommendation to soccer socks.[5]  Tr. 1344.  At no time did Dr. Gracin record that Plaintiff's failure to improve resulted from noncompliance with treatment.  Also in June 2015, Dr. Gracin signed an opinion concluding that Plaintiff's prognosis was "fair to poor," and that, while Plaintiff could emotionally tolerate low stress work, he could not sit or stand/walk for as much as two hours each, that he would require frequent breaks to lie down, and that prolonged sitting at a sedentary job would require elevation of his feet for 50% of the time.  Tr. 1510-13.

In addition to Drs. Farr and Gracin at MGH, the other provider familiar with POTS from whom Plaintiff received care is Dr. Arthur Kennedy at Newton-Wellesley Hospital.  Plaintiff was hospitalized at Newton-Wellesley for three days in March 2013, at about the same time that he initiated care with Dr. Farr.  Plaintiff arrived at the Newton-Wellesley emergency room on March 13, 2013, and was admitted for a stay that ended on March 16, 2013.  Tr. 745-58.  Dr. Kennedy confirmed the newly made diagnosis of POTS based on reported symptoms of

---

[5] At the hearing, Plaintiff testified that he complied with this treatment recommendation.  Tr. 94.  There is no evidence that he did not.

dizziness, lightheadedness, weakness, fatigue, heart palpitations, shortness of breath and difficulty with daily functions, as well as clinical observations of a heart rate swing from 86 to 115 beats per minute when Plaintiff moved from a supine position to standing.  Tr. 766-68.  Dr. Kennedy deemed his condition extremely serious; Plaintiff was admitted and vigorous intravenous hydration was administered, which improved the heart rate surge significantly.  Tr. 756.  In light of Plaintiff's obvious anxiety, Dr. Kennedy sent him to a psychiatrist, Dr. Tina Lusignolo, who diagnosed adjustment disorder, with anxious mood.  Tr. 759-65.  Dr. Lusignolo recorded Plaintiff's report to her of blood pooling in his lower extremities, causing them to turn red, but not to swell.  Tr. 759.

Throughout this medical odyssey, Plaintiff continued regularly to see Dr. Viccione for his primary care.  See, e.g., Tr. 788-868, 1331-1342, 1500-1506.  Dr. Viccione's records reflect the same complaints as those reported to the physicians at MGH and Newton-Wellesley, but also make clear that Dr. Viccione was not treating either vertigo or POTS, but rather was deferring to the specialists.  Tr. 808, 1330, 1341.  His principal role seemed to be to fill in the out-of-work form for Mohegan Sun, which he continued to do until the end of March 2013.  Tr. 824-25, 844, 853-82.  However, on April 1, 2013, Dr. Viccione wrote a note on a prescription pad stating "Return to work . . . Full Duty without restriction."  Tr. 823.  Several months later, on November 4, 2013, Dr. Viccione supplied an opinion in connection with Plaintiff's disability application that described limitations permitting at least sedentary work.  Tr. 1011; see Tr. 153 (ALJ finds Dr. Viccione's opinion would permit work between "the light and sedentary levels of exertion").  But then, a year later on November 10, 2014, Dr. Viccione repudiated both of these opinions in a letter that stated that he believed Plaintiff had been continuously disabled throughout 2013 and as of the date of his letter; however, his letter is conclusory and contains no opinion regarding

Plaintiff's functional limitations.  Tr. 1310.  In a post-decision submission, Plaintiff explained that Dr. Viccione's return-to-work note was written at Plaintiff's request based on his optimism that he was finally diagnosed with POTS and that it would improve dramatically with treatment. Tr. 417.

One other feature of Plaintiff's medical history is note-worthy: the extraordinary number of times he went to the emergency rooms at South County Hospital, Kent Hospital and Rhode Island Hospital between June 2012 and mid-to-late-2014, when these visits became less frequent. Tr. 102-33, 467-744, 1034-1121, 1138-89, 1359-1455, 1495-99.  During these emergency room trips, which were sometimes within days of each other, Plaintiff complained of such symptoms as chest pain, heart palpitations, a pounding heart, shortness of breath, sweating, dizziness, fainting, neck pressure and abdominal pain.  See, e.g., Tr. 532, 592, 1157.  Thus, these emergency room providers were evaluating the same symptoms that Plaintiff reported to the MGH and Newton-Wellesley physicians, who associated them with POTS.  In all, these hospitals amassed a cumulative medical record amounting to more than five hundred pages, virtually all of which reflects an untold number of tests, x-rays, scans and MRIs, studying Plaintiff's heart, lungs, abdomen and neck, virtually all of which were negative.  In nearly every instance, Plaintiff was discharged from the emergency room with no treatment recommendations beyond an over-the-counter analgesic.  See, e.g., Tr. 1149.

## II.    Travel of the Case

Plaintiff applied for DIB and SSI on April 3, 2013, Tr. 119-20, alleging that he became disabled on June 5, 2012, Tr. 110, due to orthostatic tachycardia and inner ear dysfunction, Tr. 341.  After his claims were denied initially, Tr. 119-20, and on reconsideration, Tr. 121-22, Plaintiff requested a hearing, Tr. 175, and testified before the ALJ in October 2014, Tr. 54-77.

The ALJ denied Plaintiff's claims later that month.  Tr. 146-55.  In March 2015, the Appeals

Council vacated the ALJ's decision and remanded the case for a new hearing.  Tr. 161-63; see

also 20 C.F.R. § 404.977(a).  The ALJ held another hearing in July 2015, Tr. 80-100, and denied

Plaintiff's claims for a second time on July 31, 2015, Tr. 30-45.  The Appeals Council denied

Plaintiff's request for review in September 2015, Tr. 1-4, and, by doing so, made the ALJ's

decision the Commissioner's final decision.  20 C.F.R. § 404.981.  Plaintiff filed his complaint

later that month.  ECF No. 1.

## III.   Issues Presented

Plaintiff's motion for reversal rests on the arguments that the ALJ erred in his evaluation

of the opinions of the treating physicians and evaluation of Plaintiff's credibility.

## IV.   Standard of Review

The Commissioner's findings of fact are conclusive if supported by substantial evidence.

42 U.S.C. § 405(g).  Substantial evidence is more than a scintilla – that is, the evidence must do

more than merely create a suspicion of the existence of a fact, and must include such relevant

evidence as a reasonable person would accept as adequate to support the conclusion.  Ortiz v.

Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (per curiam); Rodriguez v.

Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); Brown v. Apfel, 71 F.

Supp. 2d 28, 30 (D.R.I. 1999).  Once the Court concludes that the decision is supported by

substantial evidence, the Commissioner must be affirmed, even if the Court would have reached

a contrary result as finder of fact.  Rodriguez Pagan v. Sec'y of Health & Human Servs., 819

F.2d 1, 3 (1st Cir. 1987); see also Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991);

Lizotte v. Sec'y of Health & Human Servs., 654 F.2d 127, 128 (1st Cir. 1981).

The determination of substantiality is based upon an evaluation of the record as a whole. Brown, 71 F. Supp. 2d at 30; see also Frustaglia v. Sec'y of Health & Human Servs., 829 F.2d 192, 195 (1st Cir. 1987); Parker v. Bowen, 793 F.2d 1177, 1180 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).  Thus, the Court's role in reviewing the Commissioner's decision is limited.  Brown, 71 F. Supp. 2d at 30. The Court does not reinterpret the evidence or otherwise substitute its own judgment for that of the Commissioner.  Id. at 30-31 (citing Colon v. Sec'y of Health & Human Servs., 877 F.2d 148, 153 (1st Cir. 1989)).  "[T]he resolution of conflicts in the evidence is for the Commissioner, not the courts."  Id. at 31 (citing Richardson v. Perales, 402 U.S. 389, 399 (1971)).  A claimant's complaints alone cannot provide a basis for entitlement when they are not supported by medical evidence.  See Avery v. Sec'y of Health & Human Servs., 797 F.2d 19, 20-21 (1st Cir. 1986); 20 C.F.R. § 404.1529(a).

The Court must reverse the ALJ's decision on plenary review, if the ALJ applies incorrect law, or if the ALJ fails to provide the Court with sufficient reasoning to determine that the law was applied properly.  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam); accord Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir. 1991).  Remand is unnecessary where all of the essential evidence was before the Appeals Council when it denied review, and the evidence establishes without any doubt that the claimant was disabled.  Seavey v. Barnhart, 276 F.3d 1, 11 (1st Cir. 2001) (citing Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir. 1985)).

The Court may remand a case to the Commissioner for a rehearing under Sentence Four of 42 U.S.C. § 405(g); under Sentence Six of 42 U.S.C. § 405(g); or under both sentences. Jackson v. Chater, 99 F.3d 1086, 1097-98 (11th Cir. 1996).  A Sentence Four remand is in issue in this case.

To remand under Sentence Four, the Court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim. Seavey, 276 F.3d at 9; accord Brenem v. Harris, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled). Where the Court cannot discern the basis for the Commissioner's decision, a Sentence Four remand may be appropriate to allow an explanation of the basis for the decision. Freeman v. Barnhart, 274 F.3d 606, 609-10 (1st Cir. 2001). On remand under Sentence Four, the ALJ should review the case on a complete record, including any new material evidence. Diorio v. Heckler, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council). After a Sentence Four remand, the Court enters a final and appealable judgment immediately, and thus loses jurisdiction. Freeman, 274 F.3d at 610.

## V.    Disability Determination

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 416(I); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-1511.

### A.    Treating Physicians and Other Sources

Substantial weight should be given to the opinion, diagnosis and medical evidence of a treating physician unless there are good reasons to do otherwise. See Rohrberg v. Apfel, 26 F. Supp. 2d 303, 311 (D. Mass. 1998); 20 C.F.R. § 404.1527(c). If a treating physician's opinion

on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. Konuch v. Astrue, No. 11-193L, 2012 WL 5032667, at *4-5 (D.R.I. Sept. 13, 2012); 20 C.F.R. § 404.1527(c)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. See Keating v. Sec'y of Health & Human Servs., 848 F.2d 271, 275-76 (1st Cir. 1988). The ALJ's decision must articulate the weight given, providing "good reasons" for the determination. See Sargent v. Astrue, No. CA 11–220 ML, 2012 WL 5413132, at *7-8, 11-12 (D.R.I. Sept. 20, 2012) (where ALJ failed to point to evidence to support weight accorded treating source opinion, court will not speculate and try to glean from the record; remand so that ALJ can explicitly set forth findings).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. See Wheeler v. Heckler, 784 F.2d 1073, 1075 (11th Cir. 1986). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on the (1) length of the treatment relationship and the frequency of examination; (2) nature and extent of the treatment relationship; (3) medical evidence supporting the opinion; (4) consistency with the record as a whole; (5) specialization in the medical conditions at issue; and (6) other factors which tend to support or contradict the opinion. 20 C.F.R § 404.1527(c). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. See 20 C.F.R. § 404.1527(c)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for

making the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527(d). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity ("RFC"), see 20 C.F.R. § 404.1545-1546, or the application of vocational factors because that ultimate determination is the province of the Commissioner. 20 C.F.R. § 404.1527(d); see also Dudley v. Sec'y of Health & Human Servs., 816 F.2d 792, 794 (1st Cir. 1987) (per curiam).

### B.    Evaluation of Subjective Symptoms

When an ALJ decides not to credit a claimant's testimony, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding. See Da Rosa v. Sec'y of Health & Human Servs., 803 F.2d 24, 26 (1st Cir. 1986); Rohrberg, 26 F. Supp. 2d at 309-10. A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence. See Frustaglia, 829 F.2d at 195. The lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. See Smallwood v. Schweiker, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence so that the credibility determination is determinative, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." Foote v. Chater, 67 F.3d 1553, 1562 (11th Cir. 1995) (quoting Tieniber v. Heckler, 720 F.2d 1251, 1255 (11th Cir. 1983)).

Guidance in evaluating the claimant's statements regarding the intensity, persistence, and limiting effects of subjective symptoms is provided by the Commissioner's 2016 ruling, which

superseded SSR 96-7p.[6]  SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  In considering the

intensity, persistence, and limiting effects of an individual's symptoms, the ALJ must consider

the entire case record, including the objective medical evidence; an individual's statements about

the intensity, persistence, and limiting effects of symptoms; statements and other information

provided by medical sources and other persons; and any other relevant evidence in the

individual's case record.  Id. at *4.  The ALJ must also consider whether an individual's

statements about the intensity, persistence, and limiting effects of his or her symptoms are

consistent with the medical signs and laboratory findings of record.  Id.

## VI.     Application and Analysis

### A.     Opinions of Cardiologists and Primary Care Physician

In his evaluation of Plaintiff's physical symptoms, the ALJ ignored the September 2013

opinion of the first of the two non-examining state agency physicians who reviewed the file,

gave "limited weight" to the February 2014 opinion of the second file-reviewer, afforded no

weight to the September 2014 and June 2015 opinions of the two treating cardiologists, and gave

"great weight" to Dr. Viccione's April and November 2013 opinions, which Dr. Viccione

himself repudiated in a third opinion written in November 2014.  My recommendation that this

case must be remanded is based on the errors that taint these determinations.

Other than his lay interpretation of this complex medical record, the ALJ's principal

foundation for his RFC is the 2013 treating opinions of the primary care physician, Dr. Viccione.

In placing "great" reliance on these two opinions, the ALJ had to reject Dr. Viccione's third

opinion, the November 2014 letter, which is a complete repudiation of his 2013 opinions.  While

there is no error in the ALJ's decision to ignore the conclusory statements in the 2014 letter in

---

[6] At the time the ALJ conducted a hearing and issued his decision, SSR 96-7p controlled as the effective date for SSR 16-3p is March 16, 2016.  There are no material differences between the two rulings for the purposes of this case.

making his RFC finding, <u>Keating</u>, 848 F.2d 275-76 (wholly conclusory treating opinion may be discounted), it is another matter entirely to ignore the reality that the 2014 letter eviscerates the viability of Dr. Viccione's 2013 opinions.

The ALJ justifies his decision to disregard Dr. Viccione's about-face based on Dr. Viccione's failure to explain his change of position or to buttress it with "positive findings on examination." Tr. 42. Based on my review of the record, I find that this makes no sense. From his notes, it is plain that Dr. Viccione was aware that Plaintiff was being treated by specialists who had diagnosed POTS, but that he was not involved at all with either the POTS diagnosis or treatment. <u>See, e.g.</u>, Tr. 808, 1330, 1341. Nothing in the file suggests that Dr. Viccione ever reviewed any of the treating records from any of the physicians or therapists at MGH or at Newton-Wellesley.[7] Having reviewed the record in its entirety, I find that a fair read permits the conclusion that Dr. Viccione opined about the conditions he was treating, which did not include POTS, and that, when Plaintiff pointed out to him the ALJ's use of his 2013 opinions in the first decision, Tr. 1341, he withdrew them in 2014. Dr. Viccione did not supply a new opinion with functional limitations arising from POTS because he lacked the clinical information that would permit him to do so. I find that it was error for the ALJ to base his RFC opinion on a physician who deferred to the specialists with respect to the claimant's most significant impairment and who explicitly withdrew the opinion that Plaintiff's limitations permitted him to work once the significance afforded to his opinion was brought to his attention.

Tacitly acknowledging that this deficit leaves only the ALJ's lay opinion as the foundation for his RFC, the Commissioner attempts to shore up the RFC by pointing to the "limited weight" afforded to the opinion of the non-examining state agency medical consultant,

_____

[7] A small portion of the Newton-Wellesley record is in the file of Coastal Medical, where Dr. Viccione practiced. Tr. 885-86. However, there is no reference to it in Dr. Viccione's notes.

Dr. Quinn, who found in February 2014, that Plaintiff's physical impairments, including POTS, caused no exertional limitations, including no limits on the time Plaintiff can stand or walk, and caused only a few postural limitations.  Tr. 43.  This argument is unavailing.  For starters, the ALJ himself appears to reject Dr. Quinn's opinion; nothing in his opinion suggests that he drew any aspect of his RFC from Dr. Quinn.  See SEC v. Chenery Corp., 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); MaineGeneral Med. Ctr. v. Shalala, 205 F.3d 493, 501 (1st Cir. 2000) ("Courts are generally not permitted to affirm agency action on grounds implicating the agency's policy judgments or discretion other than those advanced by the agency whose actions are under review.") (citing SEC v. Chenery Corp., 318 U.S. at 88).  Moreover, Dr. Quinn's explanation of his opinion makes clear that he focused on the repeated emergency room trips, almost all of which ended with a recommendation to go home.  Tr. 130, 140.  His only reference to POTS discounts the diagnosis based on a misunderstanding of its primary symptom. Tr. 130, 140 ("Dx as POTS w/ postural hypotension But increased (not decreased) heart rate"). Moreover, Dr. Quinn's conclusion that Plaintiff had no limits in sitting and standing appears almost absurdly inconsistent with everything in the medical record.  If, as the Commissioner now argues, Dr. Quinn's flawed opinion was afforded actual weight and impacted the RFC finding at all, I find that the ALJ erred in so doing.

The Viccione/Quinn errors are enough to require remand.  With no viable medical expert who examined the POTS treating record and concluded that Plaintiff could still work, the ALJ's approach results in an RFC that is based only his lay interpretation of Dr. Farr's and Dr. Gracin's treating records.  See Alcantara v. Astrue, 257 F. App'x 333, 334 (1st Cir. 2007) ("Absent a medical advisor's or consultant's assessment of the full record, the ALJ effectively substituted

his own judgment for medical opinion."); Nguyen, 172 F.3d at 35 ("as a lay person . . . [an ALJ

is] simply not qualified to interpret raw medical data in functional terms"); Hall v. Colvin, 18 F.

Supp. 3d 144 (D.R.I. 2014) (remand ordered because ALJ relied on medical opinions not based

on entire record, interpreted medical data, and resolved inconsistencies in record, including GAF

scores, without assistance from any medical source).  Thus, no matter the outcome of the Court's

analysis of the weight afforded to the opinions of Drs. Farr and Gracin, this case must be

remanded for further proceedings.

      I turn next to what I find is the more serious error – the ALJ's determination that the

opinions of both of the treating MGH cardiologists are entitled to no weight whatsoever.

      The ALJ decided to afford no weight to the opinion of Dr. Farr, a recognized expert in

the treatment of POTS, because he found that it clashed with Dr. Farr's own treating notes and

with the overall record.  Tr. 43.  This conclusion is grounded on Plaintiff's improvement during

the MGH physical therapy sessions, which Dr. Farr was actively monitoring.  Tr. 43.  The ALJ is

right that, during these sessions, Plaintiff reported small victories, such as his ability to mow half

his lawn, ride a bike for up to twenty-five minutes, help with household chores and spend time

shopping.  Tr. 1203, 1207, 1212, 1231.  However, in a physical therapy summary, written in

September 2014, the same month when Dr. Farr wrote his opinion, the therapy team noted that,

while Plaintiff experienced "functional improvement in activity tolerance since starting therapy,"

and could do "supine/sitting exercises," he "is not functioning at prior level."  Tr. 1203-04.  This

therapy note includes the warning that, due to POTS, Plaintiff's heart rate and blood pressure

must be monitored during standing and activity.  Tr. 1203.

      These therapy notes are entirely consistent with Dr. Farr's contemporaneous treatment

notes, which record Dr. Farr's awareness of the improvement, but frustration with Plaintiff's

relatively insignificant progress in therapy.  See Tr. 1293 (POTS "limits his ability to remain standing for more than 15 minutes or to sit for more than 45 minutes without a break"). Similarly, in April 2014, Dr. Farr noted Plaintiff's significant improvement from therapy and other treatment, in that "before he could not stand at all," but that he remained seriously limited in that he could only stand for between ten and thirty-five minutes and that he continued to experience blanchable erythema in his feet and shins when he stood.  Tr. 1294-95.  And Dr. Farr's opinion – that Plaintiff has significant limits on the ability to sit or stand and would need lengthy unscheduled breaks – is entirely consistent with these treatment-based limitations.  Tr. 1309.  Tellingly, the Commissioner argues only that Plaintiff's attorney failed to develop the argument that it was error to discount the Farr opinion.  Focusing less on the attorney's unquestionably skimpy argument, but rather on the overall medical record and Dr. Farr's treating notes, I find that the ALJ erred when he decided to afford Dr. Farr's opinion no weight.  See Renaud v. Colvin, 111 F. Supp. 3d 155, 162 (D.R.I. 2015) (treating physician's opinion is to be given controlling weight when it is consistent with other treating sources and no other physician contradicts the opinion); Ferguson v. Colvin, 63 F. Supp. 3d 207, 213 (D.R.I. 2014) (treating physician was "qualified and competent" to offer an opinion as a "treating source" where physician personally evaluated and treated plaintiff for two years, he had access to all relevant medical records, and his opinion was consistent will all medical records and objective testing).

Like Dr. Farr's opinion, the ALJ rejected Dr. Gracin's opinion because he found it to be inconsistent with her treating notes and with the longitudinal treating record.  Tr. 43.  This finding appears to be based on the ALJ's misunderstanding of the diagnostic significance of Dr. Gracin's repeated references to blanchable erythema of the lower extremities, which she explains is a sign of POTS that indicates the pooling of blood; her notes are clear that this is not a stand-

alone limitation.  Tr. 1344.  This error is compounded by the ALJ's mistaken conclusion that
erythema was not mentioned in any other treating records or until March 2015.  Compare Tr. 42-
43 (ALJ concludes that erythema first noted in March 2015), with Tr. 759 (blood pooling in
lower extremities noted in March 2013 at Newton-Wellesley Hospital), Tr. 1291-92 (erythema
noted in March 2013 by Dr. Farr), and Tr. 1344 (erythema noted in November 2014 by Dr.
Gracin).

    More significantly, the ALJ erroneously concluded that, because Dr. Gracin's treating
notes do not mention leg elevation above the waist, they are inconsistent with her opinion that
the need to lie down or to elevate the legs at least half of the time if sitting for a "prolonged
period" is a medical requirement that would significantly impede Plaintiff's ability to work.  Tr.
43.  The ALJ is simply wrong.  Dr. Gracin consistently opined (as did both Dr. Farr[8] and Dr.
Parker[9]) that Plaintiff could only stand for a short period (twenty minutes) or sit for a slightly
longer period (forty-five minutes).  Tr. 1343, 1346, 1351, 1478.  After that, her treating notes say
that POTS would require a "reset," which would take between a few minutes to half an hour.  Tr.
1343, 1346, 1351, 1478.  As the medical record makes clear, "reset" means that, after twenty
minutes of standing and forty-five minutes of sitting, Plaintiff must elevate his legs long enough
to bring the blood pooled in his lower extremities back into circulation.  Thus, the treating record
references to the need for a "reset" after forty-five minutes of sitting that would take up to half an
hour is entirely consistent with the recommendation to keep the feet above the heart for half the
time during prolonged sitting.  The absence of a treating record with a specific recommendation
to keep the legs elevated when working at a sedentary job is obviously because Plaintiff never

---

[8] Dr. Farr referred to Plaintiff's need to "take a break" after standing or sitting.  E.g., Tr. 1293.

[9] Dr. Parker referred to Plaintiff's inability to stand without faintness and dizziness.  Tr. 1284.

attempted sedentary work and therefore never asked Dr. Gracin for her medical recommendation regarding how he should deal with "prolonged sitting."

The Commissioner also argues that Dr. Gracin's reference in her opinion to the "inability to sustain blood pressure in the standing position," Tr. 1510, does not jive with the contemporaneous therapy notation that "blood pressure remained intact."[10]  Tr. 43.  The Gracin treating notes consistently refer not only to a surge in the heart rate when standing, but also to a drop in blood pressure.  See, e.g., Tr. 1507 (Plaintiff's supine heart rate and blood pressure are 74 and 102/60 respectively, but when he sits or stands, heart rate surges to 106, while blood pressure drops to 90/70).  Consistently, Dr. Farr's treating notes record a reduction in blood pressure on standing.  Tr. 1291-92 (at intake, Plaintiff's supine heart and blood pressure 91 and 104/60, while the standing heart rate surged to 132, while blood pressure dropped to 98/60).  Dr. Kennedy also referred to Plaintiff's drop in blood pressure on standing as material to his POTS symptoms.  See Tr. 770 (when blood pressure drops patient must stop what he is doing).  The ALJ's confusion appears to be based on the fact that Plaintiff's blood pressure was stable as he moved from supine to sitting to standing at one appointment with Dr. Gracin.  Tr. 1479.  This single measurement is reflected in the therapy notes as "stable blood pressure."  Tr. 1471, 1477.  However, at the next appointment with Dr. Gracin (just before she wrote her opinion), the blood pressure was not stable, but dropped when Plaintiff moved from lying down to sitting or standing.  Tr. 1507.

---

[10] The Commissioner also argues that the opinion is flawed by other, more minor, discrepancies.  For example, Dr. Gracin's opinion that Plaintiff could only rarely lift ten pounds, Tr. 1512, seems different from Plaintiff's claim to a physical therapist that he could bench-press seventy pounds and curl fifteen pounds.  Tr. 1470.  Similarly, Dr. Gracin's opinion that Plaintiff could only walk for one block without rest or severe pain, Tr. 1511, may be inconsistent with Plaintiff's claim only days earlier that he could walk for three-quarters of a mile.  Tr. 1507.  Third, Dr. Gracin opined that Plaintiff could never crouch or squat in performing work, Tr. 1512, yet during physical therapy Plaintiff was able to do lunges and squats.  Tr. 1470-71.  I do not find that these de minimis inconsistencies justify the complete rejection of Dr. Gracin's opinion.  What Plaintiff could do in physical therapy where his heart rate and blood pressure were consistently monitored is not necessarily consistent with what he would be able to do in a competitive work place.

One stable blood pressure measurement, in a record that otherwise shows it dropping when sitting or standing, does render Dr. Gracin's opinion inconsistent with either her treating record or with the longitudinal treating record, nor does it justify the ALJ's rejection of the opinion.  I find that Dr. Gracin's opinion, apart from the *de minimis* discrepancies noted in footnote 10, is entirely consistent with her treating record and with the treating notes of the other providers directly involved with managing Plaintiff's POTS.  It was error for the ALJ entirely to reject it.  <u>See</u> <u>Bates v. Colvin</u>, 736 F.3d 1093, 1100 (7th Cir. 2013) (treating physician's evidence, while not entitled to controlling weight when contradicting evidence introduced, becomes one more piece of evidence for the ALJ to consider); <u>Bauer v. Astrue</u>, 532 F.3d 606, 608 (7th Cir. 2008) (where there is evidence that contradicts treating physician's opinion, 20 C.F.R. § 404.1527(d)(2)'s treating source rule falls out and the rule's list of various factors should be considered by ALJ in determining what weight to give it).

Based on the foregoing, I find that the ALJ erred in rejecting the opinions of the well-qualified treating cardiologists and in relying on the repudiated 2013 opinions of the primary care physician.  Lacking the medical expertise to evaluate this complex medical record and draw conclusions from it, the ALJ was left only with his lay interpretation; this resulted in a residual functional capacity finding that is without substantial evidence to support it.  Accordingly, I recommend that the matter should be remanded.

### B.     Credibility

In making an adverse credibility finding, the ALJ's obligation is to provide "specific reasons . . . supported by the evidence in the case record."  SSR 96-7p at *2.  As long as the ALJ hits that mark, the Court must defer because it is the ALJ who observes the demeanor of the claimant.  <u>Frustaglia</u>, 829 F.2d at 195.  Here, I find that the ALJ recited sufficient "reasons" to

support his credibility finding.  Specifically, the ALJ noted that Plaintiff testified at the hearing

as if his dire condition before he initiated POTS treatment had persisted, despite a record

reflecting that, by then, he had experienced significant improvement.  Tr. 41-42.  Consistent with

the evidence of improvement are the many references in the physical therapy record to various

activities inconsistent with Plaintiff's claim of being forced to lie on a pad all day long.

Compare Tr. 64 ("I lay on [sleeping pad] all day"), with Tr. 1205 (can assist with household

chores), Tr. 1474 (able to go to the mall), and Tr. 1500 (able to ride stationary bike).  While the

ALJ erred in considering lack of compliance in not wearing compression socks and in finding

that erythema in the lower extremities was not mentioned in the record until March 2015, I find

that these errors can be set aside, leaving enough intact to avoid remand based on an erroneous

credibility finding.  See Johnson v. Comm'r of Soc. Sec., 535 F. App'x 498, 507 (6th Cir. 2013)

("even if an ALJ's adverse credibility determination is based partially on invalid reasons,

harmless error analysis applies to the determination, and the ALJ's decision will be upheld as

long as substantial evidence remains to support it"); Carmickle v. Comm'r of Soc. Sec. Admin.,

533 F.3d 1155, 1162 (9th Cir. 2008) ("So long as there remains substantial evidence supporting

the ALJ's conclusions on credibility and the error does not negate the validity of the ALJ's

ultimate credibility conclusion, such is deemed harmless and does not warrant reversal.").

## VII.   Conclusion

Based on the foregoing, I recommend that Plaintiff's Motion to Reverse the Decision of

the Commissioner (ECF No. 9) be GRANTED and Defendant's Motion to Affirm Her Decision

(ECF No. 13) be DENIED.  Any objection to this report and recommendation must be specific

and must be served and filed with the Clerk of the Court within fourteen (14) days after its

service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file

specific objections in a timely manner constitutes waiver of the right to review by the district

judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d

5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir.

1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
November 16, 2016